AO 106 (Rev. 04/10) Application for a Search Warrant          AUTHORIZED AND APPROVED/DATE: s/ Nick Coffey 5/10/23

# UNITED STATES DISTRICT COURT
for the
Western District of Oklahoma

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No. M-24-422-STE
A red iPhone, with serial number G6TDTBMG0DXR, )
located at FBI Oklahoma City, 3301 W. Memorial Road, )
Oklahoma City, OK 73134 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the      Western      District of      Oklahoma      , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Drug Conspiracy |
| 21 U.S.C. § 841 | Distribution of a Controlled Substance |

The application is based on these facts:

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

John Krawczyk, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **May 10, 2024**

_____
*Judge's signature*

City and state: Oklahoma City, Oklahoma

Shon T. Erwin, U.S. Magistrate Judge
*Printed name and title*

# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In the matter of the search of (1) a red iPhone 12, serial number G6TDTBMG0DXR, and (2) a black iPhone with a cracked screen, both used by Ray David Lara | Case No. M-24-422-STE |

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

I, John Krawczyk, Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I have been a Special Agent with the FBI since April 2023. I am currently assigned to the Oklahoma City Division, where I am assigned to the Criminal Enterprise Squad, which is responsible for investigating street gang and drug related offenses. Since becoming a Special Agent, I have been involved in a variety of investigative matters, including investigations targeting large criminal enterprises, most of which involved the unlawful distribution of narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 846. Prior to joining the FBI, I was a Police Officer in Philadelphia, Pennsylvania, from February 2010 to December 2022. In that capacity, I investigated a variety of crimes, including drug crimes, robberies, burglaries, assaults, and various other criminal activities. As part of my drug-related investigations, I have participated in the execution of numerous search and arrest warrants, conducted physical surveillance, coordinated controlled purchases with confidential sources, analyzed records documenting the purchase and sale of illegal drugs,

1

and spoken with informants, as well as other local and federal law enforcement officers, regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their illegal drugs.

2. The information contained in this Affidavit is submitted for the limited purpose of establishing probable cause to secure a search warrant for two cellphones belonging to Ray David Lara (**LARA**), specifically (1) a red iPhone 12, bearing serial number G6TDTBMG0DXR (**Subject Device 1**), and (2) a black iPhone with a cracked screen and frame (**Subject Device 2**) (collectively, the **Subject Devices**), which are in the possession of the Federal Bureau of Investigation – Oklahoma City Field Office in the Western District of Oklahoma, as further described in **Attachment A**, for evidence of violations of 21 U.S.C. §§ 841(a) (Possession with Intent to Distribute a Controlled Substance) and 846 (Conspiracy to Possess with Intent to Distribute and to Distribute a Controlled Substance), as described further in **Attachment B**, (description of items to be searched).

3. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me regarding this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a search warrant. The information contained in this Affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers and witnesses, and review of documents and records.

## PROBABLE CAUSE

4. Law enforcement first became aware of Oscar Hernandez (Hernandez) and the drug trafficking organization (the "DTO") described herein in 2018 during an investigation targeting the Irish Mob Gang ("IMG"), an Oklahoma prison gang that was trafficking drugs across the state of Oklahoma and beyond. During the investigation, which utilized Title III wiretaps, law enforcement intercepted Hernandez and identified him as one of the IMG's principal sources of supply of methamphetamine. These IMG members and their associates were ultimately indicted and convicted. *See United States v. Velasquez*, CR-18-260-SLP. Next, from roughly 2019 to 2021, law enforcement began targeting Hernandez's distribution network. During that portion of the investigation ("Phase 1") investigators uncovered a massive methamphetamine distribution network led by Hernandez.

5. Phase 1 established that Hernandez, who was residing in San Luis Potosi, Mexico, relied on trusted family members and confidants in Oklahoma to conduct the day-to-day operations of the DTO. Those individuals in Oklahoma distributed thousands of pounds of methamphetamine to customers of the DTO and collected millions of dollars in drug proceeds—all at Hernandez's direction. Prior to that distribution, the crystal meth was converted from its liquid form at multiple clandestine laboratories in rural Oklahoma. While these labs were owned by Hernandez's family members and co-conspirators, the individuals that worked at the labs (hereafter referred to as the "lab workers") appeared to report to the ultimate source of supply, whom cooperators identified as "Mamisan." Law enforcement

3

also found evidence indicating "Mamisan" was the individual responsible for coordinating the shipments of liquid methamphetamine from Mexico to Oklahoma; the investigation established that the methamphetamine was being transported in the gas tanks of a semi-truck, which was owned by and registered to a company called DGC Express. DGC Express, in turn, listed its registered agent as Nelly Gutierrez (Nelly), according to the Texas office of the comptroller. Once the semi-truck arrived in Oklahoma, it was received by the lab workers at a private location, where the liquid methamphetamine could be extracted, placed into transportable containers, and ultimately taken to the clandestine lab location for conversion, after which the crystal meth was returned to Oklahoma City for distribution.

6. As a result of Phase 1 of the investigation, federal charges were filed in the Western District of Oklahoma against more than forty persons, including Hernandez (*see United States v. Hernandez*, CR-21-76-SLP), members of his incarcerated customer base (*see United States v. Baswell*, CR-21-77-SLP), and two truck drivers (*see United States v. Cedillo*, CR-21-288-SLP, *and United States v. Lucio*, CR-21-289-SLP). In addition, law enforcement executed over a dozen search warrants, including at the liquid methamphetamine delivery location and two clandestine labs used by the DTO. Law enforcement also made significant drug and money seizures, including over one thousand pounds of methamphetamine and more than $1 million in U.S. currency. At the time, this coordinated effort significantly disrupted Hernandez's and the overall DTO's operation. It was not until the fall of 2022, however—with the help of a newly developed confidential

human source (CS1)[1]—that law enforcement launched the second phase of the investigation into the DTO described herein (Phase 2).

7.      On September 21, 2023, United States District Judge Jodi W. Dishman for the Western District of Oklahoma, issued two orders—the first authorizing the interception of oral communications inside the DTO's warehouse at 701 SE 29th St., Oklahoma City, Oklahoma (the "29th St. Warehouse"), and the second authorizing the monitoring and recording of visual, non-verbal conduct inside the warehouse. The Government's application named several DTO members, including **LARA**, as "Target Subjects". Law enforcement monitored activity inside the 29th St. Warehouse for a total of 87 days.[2] During that time, law enforcement was able to observe three deliveries of liquid methamphetamine

---

[1]     CS1 was arrested by law enforcement for drug related crimes. CS1 thereafter agreed to assist law enforcement and began providing information relating to this investigation in the fall of 2022. Prior to this last arrest, CS1 had been convicted of drug related crimes in 1998 (manufacturing), 2007 (trafficking), and 2021 (possession). CS1 furnished information to law enforcement in hopes of receiving consideration for his/her most recent pending charges. CS1 has also received $1,000 in monetary compensation to date for his/her cooperation. The information provided by CS1 has been corroborated through other investigative techniques including physical surveillance, consensually recorded conversations, and telephone analysis. Information provided by CS1 has been reliable and I am unaware of any knowingly false information furnished by CS1. Information attributed to CS1 herein, unless otherwise noted, was obtained by CS1 through his/her personal observations or conversations with targets of this investigation and their associates.

[2]     Law enforcement received two additional bug and/or CCTV authorizations for the 29th St. Warehouse after this initial round. First, on October 20, 2023, United States District Judge Scott L. Palk authorized the continued monitoring and recording of visual, non-verbal conduct inside the warehouse. Then, on November 17, 2023, United States District Judge Jodi W. Dishman authorized the renewed interception of oral communications and the continued monitoring and recording of visual, non-verbal conduct inside the same location.

in real time as they occurred on November 10, November 17, and December 6, 2023. **LARA** was involved in each of these deliveries. For instance, for the November 10 delivery, **LARA** was present at the 29th St. Warehouse and, once the liquid meth had been extracted from the gas tank of the semi-truck into an IBC tank, he helped load the tank of liquid meth into a black pull-behind trailer that was later taken out to the DTO's methamphetamine conversion lab at 980801 S Stage Coach Drive, Wellston, Oklahoma (the "Wellston Lab").

8. On December 8, 2023—two days after the December 6 delivery—the FBI executed a search warrant at the Wellston Lab, seizing more than 150 gallons of liquid meth and more than 50 lbs. of crystal meth, which appeared based on my training and experience to have been recently converted from liquid form.

9. Following this, the DTO established new locations where it could make the semi-truck deliveries (i.e., the extraction point) and convert liquid meth. The DTO's new extraction point was 17500 Midnight Drive, Newalla, Oklahoma 74857 ("Midnight Drive"). GPS ping data on **LARA** shows that he previously visited the property around December 17, 2024. Law enforcement executed a search warrant at Midnight Drive on April 1, 2024, finding 86 kilograms of crystal methamphetamine.

10. Law enforcement also identified the DTO's new conversion lab, located at 21845 Lilly Dr., Tecumseh, Oklahoma. During law enforcement surveillance in January 2024, law enforcement observed Braulio Padilla, a courier and distributor for the DTO, visit Lilly Drive on at last two occasions and retrieve what appeared to be cardboard boxes of drugs, which he then delivered to **LARA**. In short, after the December 8 search warrant at

the Wellston Property, surveillance showed that **LARA** continued to work on behalf of the DTO. Law enforcement executed a search warrant at Lilly Drive on April 1, 2024, finding 42 kilograms of crystal meth, a large amount of meth lab materials, and the black pull-behind trailer.

11. On March 19, 2024, a Grand Jury sitting in the Western District of Oklahoma returned an indictment charging **LARA** with conspiring to possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of U.S.C. § 846. Presently, law enforcement has seized over 2,000 lbs. of methamphetamine from the DTO during this investigation.

12. Law enforcement arrested **LARA** and executed a search warrant for his Oklahoma City residence on April 2, 2024. When **LARA** was arrested at a convenience store, he had **Subject Device 1** on his person. Law enforcement seized **Subject Device 1**, which is now in the FBI's custody.

13. At the time of his arrest, **LARA** informed law enforcement he recently moved residences and was residing at 1137 SE 22nd St., Oklahoma City, Oklahoma, a residence where **LARA** had previously lived prior to the house sustaining fire damage. **LARA** told law enforcement he had a second cell phone and that he would consent to law enforcement entering the residence on SE 22nd St. and seizing the phone. Elvia Galvan, **LARA's** wife, was present during this consent and used her keys to open the front door of the property. Law enforcement found **Subject Device 2** on the floor of the living room. **LARA** also identified **Subject Device 2** as his phone.

14. Based on my training and experience, I know that cellular phones such as the **Subject Devices** have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. Such cell phones and their associated memory cards commonly contain electronically stored information, including but not limited to, the phone directory and/or contacts list, calendar, text messages, e-mail messages, call logs, photographs, and videos. In my training and experience, examining data stored on devices of this type can uncover, among other things, data and information which constitutes evidence, fruits, and instrumentalities of drug trafficking offenses and evidence that reveals or suggests who possessed or used the device.

15. Furthermore, based on my training and experience, I know that it is very common for interstate drug couriers and distributors to use their phones for several reasons in the course of their criminal conduct. I am aware that individuals involved in trafficking illegal narcotics often use cell phones to maintain contact with other co-conspirators, including suppliers, transporters, distributors, and purchasers of illegal narcotics, including sending or receiving drop off locations for the drugs and discussing or negotiating the money involved in the drug deals and what to do with the proceeds from the drug transaction. Similarly, I know drug couriers or distributors often share pictures with their cellular phones of the illegal products and money being transported and laundered.

## CONCLUSION

16. Based on the above information, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a) (Possession with Intent to Distribute a Controlled Substance) and 846 (Conspiracy to Possess with Intent to Distribute a Controlled

8

Substance) have occurred, and that evidence, fruits, and instrumentalities of these offenses are located on the **Subject Device 1** and **Subject Device 2**. Therefore, I respectfully request that this Court issue search and seizure warrants authorizing the seizure of the items described in **Attachment B**, for **Subject Device 1** and **Subject Device 2**, each of which is particularly described in the **Attachment A** for that specific phone's warrant.

**FUTHER THE AFFIANT SAYETH NOT.**

JOHN KRAWCZYK
Special Agent
Federal Bureau of Investigation (FBI)

Subscribed and sworn to me telephonically this 10th day of May, 2024.

SHON T. ERWIN
United States Magistrate Judge

9

# ATTACHMENT A

**Subject Device 1**: The property to be searched is a red iPhone 12, bearing serial number G6TDTBMG0DXR

**Subject Device 1** is currently located at FBI Oklahoma City, 3301 W. Memorial Road, Oklahoma City, Oklahoma. Photos of **Subject Device** 1 are below:

**Subject Device 1**

 

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver

a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## ATTACHMENT B

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of the crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely a violation of Title 21, United States Code, Section 841(a)(1) and Title 21, United States Code, Section 846:

1. All records on the **SUBJECT DEVICE** described in **Attachment A** that relate to violations of 21 U.S.C. § § 841(a)(1) including:

    a. Lists of customers and related identifying information;

    b. Lists of co-conspirators and related identifying information;

    c. Records of communications with customers or co-conspirators, whether such communication be a telephone call, text message (e.g. SMS or MMS), instant message, or communication through an application store on the phone;

    d. Records detailing the types, amounts, prices of drugs trafficked, as well as dates, places, and amounts of specific transactions;

    e. Any information related to the sources of drugs, including names, addresses, phone number, or any other identifying information;

    f. Any audio recordings, pictures, video recordings, or still-captured images on the Subject Phone related to the purchase, sale, transportation, or distribution of controlled substances or the collection, transfer or laundering of drug proceeds;

    g. All bank records, checks, credit card bills, account information, and other financial records; and

    h. Any location data related to the acquisition of distribution of controlled substances.

2. With respect to the **SUBJECT DEVICE** used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

    a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the attachment of other devices;

    d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    e. evidence of the times the device was used;

    f. passwords, encryption keys, and other access devices that may be necessary

      to access the device;

g. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h. records of or information about Internet Protocol addresses used by the device;

i. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.